# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES A. FULLER, SR., | ) |
| | ) Civil Action No. 05 - 1645 |
| | ) |
| Petitioner, | ) |
| | ) Judge Nora Barry Fischer |
| v. | ) Magistrate Judge Lisa Pupo |
| | ) Lenihan |
| DISTRICT ATTORNEY OF | ) |
| FAYETTE COUNTY, NANCY D. | ) |
| VERNON; THE ATTORNEY | ) |
| GENERAL FOR THE STATE OF | ) |
| PENNSYLVANIA, | ) |

Respondents.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II. REPORT

Petitioner, Charles A. Fuller, Sr., has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, wherein he challenges his conviction of aggravated indecent assault and resultant sentence. For the reasons that follow, his Petition should be denied.

#### A. Relevant Facts

The relevant facts are as follows.

> Following two mistrials, appellant was convicted of aggravated indecent assault; he was then sentenced to serve 40 to 90 months in prison as well as to register, for the

rest of his life, as a sex offender. The underlying facts of this case, as brought out during the September 11-12, 2002 trial, are as follows.

It was either 1993 or 1994 when S, the victim in this case, fist moved into the home of her aunt and uncle, Amy and Charles Fuller. At the time, the victim was either 13 or 14 years of age and had moved from her parents' home due to their separation and the fact that her mother worked a lot of hours and wasn't home a lot of the time. Yet, since there was no bedroom available at the Fuller's house, the victim slept on the living room loveseat. It was during this time, when S. slept on the loveseat, that appellant Charles Fuller began sexually molesting her.

As S. testified, it would be around midnight, when everyone else was asleep, that appellant would crawl into her bed, reach inside her clothes and fondle her breasts as well as touch the inside and outside of her vagina with his fingers. The victim, however, did not tell anyone this was happening and appellant continued in his ways, doing this a few nights a week.

Approximately one year after S. first moved into the Fuller's home, she was given her own bedroom. Yet, this did not protect S. and appellant continued to do basically the same things. He would also rub his penis on [the victim's] buttocks and vaginal area, fondle [her] breasts and touch [her] with his hands. All told, appellant put his fingers inside her vagina 30 or 40 times.

Further, appellant performed multiple acts of cunnilingus upon his young niece and once, when the victim was 15 years old, appellant attempted to have anal intercourse with her. As the victim testified, appellant placed his penis inside [her] anus for a brief moment and only stopped when the victim screamed in pain.

Until the victim turned 20 years of age, she never told of these abominations that were done to her; even denying to her Aunt Amy Fuller that appellant ever touched her inappropriately.

In the year 2001, however, the victim finally came forward with her allegations. This led to an investigation and, on January 23, 2002, appellant was questioned in the Oklahoma County Jail by Trooper James Pierce (an investigator for the Pennsylvania State Police) and Detective Lawrence Curry (the Chief County Detective for the Fayette County District Attorney's Office). According to Trooper Pierce's testimony, appellant initially denied the victim's allegations. After what must have been a matter of minutes, however, appellant admitted that when the victim was 13 or 14 years old, he would place his middle finger in her vagina. He also admitted that he fondled her vagina and fondled her breasts approximately four or five times in the living room, and once inside a tent in the backyard of the residence. According to appellant, the victim would take her pants and underwear off, that he would place his middle finger into her vagina, and he went on to say that the victim would also stroke his penis. Appellant denied ever attempting anal intercourse with his niece. And, when asked to reduce his oral statement to writing, appellant refused . . . .

Appellant took the stand and denied absolutely everything. According to appellant, Trooper Peirce and Detective Curry were making all that up; he never admitted to molesting his niece. As to why the victim would invent such a story, appellant decided that this must be revenge for the way he treated his wife during the then-ongoing divorce proceedings.

The jury, however, convicted appellant of one aggravated indecent assault count (for conduct that occurred after May 30,

1995). Unanimously, the jury also found
appellant not guilty for aggravated indecent
assault (for acts prior to May 30, 1995) and
involuntary deviate sexual assault (for acts
prior to may 30, 1995). The jury deadlocked
on the charge of involuntary deviate sexual
assault (for post May 30, 1995 conduct) and
the trial court declared a mistrial on that
specific count. . . .

Sup.Ct.Op. dated May 12, 2005, pp. 1-4 (doc. no. 13-14, pp. 20-

23) (internal citations, quotations and footnotes omitted).

### B. Exhaustion Requirement

The provisions of the federal habeas corpus statute at

28 U.S.C. § 2254(b) require a state prisoner to exhaust available

state court remedies before seeking federal habeas corpus relief.

To comply with the exhaustion requirement, a state prisoner first

must have fairly presented his constitutional and federal law

issues to the state courts through direct appeal, collateral

review, state *habeas* proceedings, *mandamus* proceedings, or other

available procedures for judicial review. *See, e.g.*, Castille v.

Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d

675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d

Cir. 1996).

It appears that the Petitioner has presented the

majority of his claims to the Pennsylvania courts through his

direct appeal and his PCRA proceedings. As set forth in detail

below, it is also clear that Petitioner has not demonstrated that

he is entitled to federal habeas corpus relief with respect to

4

any of his claims.  Accordingly, to the extent that Petitioner has not fully exhausted any of his claims, this Court will review them under the authority granted in 28 U.S.C. § 2254(b)(2), which provides that a federal court may deny a petitioner's claims on the merits notwithstanding a petitioner's failure to comply with the exhaustion requirement.  *See* 28 U.S.C. § 2254(b)(2) (as amended by The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 142 Cong. Rec. H3305-01 (1996).

## C. Standard of Review

Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations.  28 U.S.C. § 2254.  Specifically, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e).  Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it."  Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly.  *Id.* (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

A federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), Justice O'Connor, writing the opinion of the Court for Part II, discussed the independent meanings of the "contrary to" and "unreasonable application" clauses contained within section 2254(d)(1).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams</u>, 529 U.S. at 411-13. *See also* <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003).

Where the state court fails to adjudicate or address the merits of a petitioner's claims, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001).

D. <u>Double Jeopardy</u>

Petitioner's first claim asserts a violation of the Double Jeopardy Clause of the Fifth Amendment. The Fifth Amendment to the Constitution provides, in pertinent part, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V.[1] The Fifth Amendment's guarantee against double jeopardy protects a criminal defendant against multiple punishments or repeated prosecutions for the same offense. <u>United States v. Dinitz</u>, 424 U.S. 600, 606 (1976). "Underlying this constitutional safeguard is the belief that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " *Id*. (citations and quotations omitted). Notwithstanding, the Double Jeopardy Clause does not guarantee that the State will vindicate its societal interest in the enforcement of the criminal laws "through the vehicle of a single proceeding for a given offense." <u>United States v. Jorn</u>, 400 U.S. 470, 484 (1971).

---

1  The Fifth Amendment proscription on multiple punishments for the same offense is binding on the States through the Fourteenth Amendment. <u>North Carolina v. Pearce</u>, 395 U.S. 711 (1969); <u>Benton v. Maryland</u>, 395 U.S. 784 (1969).

Petitioner's double jeopardy claim is twofold. First, he claims that, during his first trial, the Commonwealth wrongfully elicited a statement from a prosecution witness to purposefully cause a mistrial. Second, he claims that the second trial ending in a hung jury should have precluded a third trial.

The relevant Supreme Court precedent applicable to petitioner's double jeopardy claim is set forth in <u>Oregon v. Kennedy</u>, 456 U.S. 667 (1982) (majority opinion by Justice Rehnquist, joined by Burger (then C.J.), White and O'Connor, JJ., concurrence by Powell, J.)). In <u>Kennedy</u>, the Supreme Court discussed the difference between the double jeopardy protection afforded where the trial is terminated over the objection of the defendant vs. circumstances where a mistrial is declared at the bequest of the defendant. In the former circumstance, the Supreme Court explained that the "manifest necessity" standard is the appropriate test to determine whether to lift the double jeopardy bar to a second trial. <u>Kennedy</u>, 456 U.S. at 672 (citing <u>United States v. Perez</u>, 9 Wheat. 579, 580, 6 L.Ed. 165 (1824)). The Court further explained that the "hung jury" was the "prototypical example" meeting the manifest necessity standard such as to allow a second trial. <u>Kennedy</u>, 456 U.S. at 672.

Where a mistrial is declared at the request of the defendant, however, the Supreme Court concluded that the "manifest necessity" standard was not applicable. *Id*. In this

situation, the Court held that the Double Jeopardy Clause prohibits a second prosecution for the same offense <u>only</u> when the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial. *Id.* at 679. The Court explained its holding as follows.

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." <u>Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion</u>.

<u>Kennedy</u>, 456 U.S. at 675-76 (citation omitted) (emphasis added).

With respect to Petitioner's first claim, the Superior Court determined that the record evidence did not disclose an intention on the part of the Commonwealth to cause a mistrial. Specifically, the Court found as follows.

> . . . In this case, it is clear that Trooper Pierce's "Oklahoma City Jail" reference (which led to the June 3, 2002

9

mistrial) was a mistake on Trooper Pierce's
part; yet, it was not, at all, something
intended by the prosecutor.

During appellant's June 3, 2002 trial,
Assistant District Attorney (ADA) Jack
Heneks asked Trooper Pierce "when did you
contact the defendant?" Trooper Pierce
responded to this question by answering
"That was on January 23, of this year at the
Oklahoma City Jail in Oklahoma."
Appellant's counsel immediately objected
and, in a sidebar, moved for a mistrial. A
mistrial was then granted.

Yet, the question ADA Heneks posed to
Trooper Pierce was "when" he first contacted
the defendant, not "where." The "where" was
told by Trooper Pierce on his own and was
not even suggested by the question asked of
him. Further, at the PCRA hearing, not only
did ADA Heneks testify that a mistrial would
have been the last thing [he] would have
wanted to do in this case, but his version
of the events was corroborated by
appellant's defense attorney. As
appellant's defense attorney explained, ADA
Heneks was very upset by the mistrial and
was not happy with both the statement of
Trooper Pierce and Judge Capuzzi's ruling.

As the PCRA Court found,

the Assistant District Attorney
acted in good faith and . . . his
question was not asked in bad
faith with the intent to prejudice
or harass the defendant. There is
absolutely no evidence which
points to the conclusion that the
Assistant District Attorney
deliberately set out to abort the
first trial in order to bolster
his case against the defendant or
to secure a more favorable jury
panel. There is no evidence to
suggest that the Commonwealth was
not fully prepared or that the

prosecutor did not have all of his
witnesses available to testify.
In fact, the victim and her aunt
had been called prior to Trooper
Peirce's appearance on the witness
stand.  We find that the mistrial
occasioned in the June 3, 2002
trial was the result of a mere
error on the part of a
Commonwealth witness and not the
result of overzealous prosecution,
nor was there the intent to
prejudice or harass them.

The PCRA Court's findings are entirely
supported by the evidence:  ADA Heneks
neither directly nor indirectly intended for
Trooper Pierce's statement.  Thus, the
mistrial of June 3, 2002 did not bar any
subsequent trial for appellant's crimes and
appellant's trial counsel cannot be held
ineffective for failing to raise this
meritless claim.

Sup.Ct.Op. dated May 12, 2005, pp. 14-16 (doc. no. 13-14, pp. 33-
35) (internal citations, quotations and footnotes omitted).

This federal court is required to accord a presumption
of correctness to the Superior Court's factual finding that
petitioner's mistrial was not the result of intentional
prosecutorial conduct.  Sumner v. Mata, 449 U.S. 539, 546 (1981).
Petitioner can overcome this presumption only through the use of
clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  In
this action, Petitioner has failed to set forth any evidence
whatsoever, let alone by clear and convincing evidence, to rebut
the Superior Court's factual finding that petitioner's mistrial
was not the result of intentional prosecutorial conduct.  Nor has

11

he demonstrated that the Superior Court's determination that his second trial was not barred by the Double Jeopardy Clause is contrary to, or involved an unreasonable application of, clearly established Federal law. *See* Kennedy, 456 U.S. at 679 ("Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in the termination of the first trial in this case was not so intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution."). Accordingly, Petitioner has not carried his burden of demonstrating that he is entitled to habeas corpus relief with respect to his first double jeopardy claim.

With respect to his second double jeopardy claim, the Supreme Court specifically has held that a trial resulting in a hung jury does not bar retrial on the same charges. Kennedy, 456 U.S. at 672. Thus, the Pennsylvania Courts similar conclusion is not contrary to, or an unreasonable application of, clearly established Federal law. Accordingly, Petitioner has not carried his burden of demonstrating that he is entitled to habeas corpus relief with respect to his second double jeopardy claim.

E. Failure to Call Witnesses

In his second and third claims, Petitioner asserts that his trial counsel was ineffective for failing to contact witnesses on his behalf who would have questioned the testimony

of the prosecution witnesses and that the PCRA Court refused to allow him to present these witnesses.

With respect to his ineffective assistance of counsel claim, the Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (*quoting* <u>Strickland v. Washington</u>, 466 U.S. 668, 684 (1984)). *See also* <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. <u>Strickland</u>, 466 U.S. at 687. The first prong of the <u>Strickland</u> test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 688. The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. <u>Strickland</u>, 466 U.S. at

689.  A defendant is not entitled to relief unless he makes both

showings.  *Id*. at 687.

    With respect to Petitioner's due process allegation

that the PCRA Court erred by refusing to allow his witnesses, a

claim that one was denied "due process" is a claim that one was

denied "fundamental fairness."  *See* <u>Riggins v. Nevada</u>, 504 U.S.

127, 149 (1992).  "A trial is fundamentally unfair if there is a

reasonable probability that the verdict might have been different

had the trial been properly conducted."  <u>Foy v. Donnelly</u>, 959

F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks

omitted).

    In reviewing Petitioner's witness claims, the PCRA

Court held as follows.

> At the PCRA hearing, appellant alleged his
> counsel's ineffectiveness for failing to
> present the testimony of two individuals:
> Darlene Fronius and Amanda Perdikaris.  And,
> while appellant attempted to place the
> testimony of both women on the record, the
> PCRA judge ruled their testimony irrelevant
> and precluded their taking the stand.  While
> appellant takes issue with this ruling,
> there is no doubt it was correct.
>
> According to appellant, Darlene Fronius
>
> would have testified and attacked
> the credibility of Appellant's ex-
> wife.     Specifically,     the
> Appellant's ex-wife testified in
> the third trial that the parties
> had an amicable divorce and that
> they were not having any problems.
> Ms. Fronius would have provided
> testimony that Appellant and his

14

ex-wife had a bitter relationship
during their divorce; thus,
casting doubt on Appellant's ex-
wife's testimony as a whole.

Appellant's Brief, at 11.

The problem with appellant's claim is
that Amy Fuller, appellant's ex-wife, **never**
testified that the divorce as "amicable and
that they were not having any problems."

. . .

Appellant's claim is therefore
baseless; the testimony appellant seeks to
impeach was never spoken.

Further, even if Ms. Fuller did testify
that the divorce was "amicable," Darlene
Fronius' testimony would not entitle
appellant to a new trial. This is because
Ms. Fuller explicitly testified that she
never "witnessed Mr. Fuller touch [the
victim] . . . in an inappropriate sexual
manner." N.T. Trial, 9/11/02, at 40. The
only testimony of substance Ms. Fuller gave
concerned the fact that she had, on one
occasion, woken "up in the middle of the
night and found my husband not in bed, he
was gone for a while so I got up to check to
see where he was and he was standing in [the
victim]'s room." *Id*. at 38. Appellant was,
however, fully clothed, the victim was
sleeping in bed, and appellant was merely
standing in her room. According to
appellant's explanation at the time, he was
just "checking on her." *Id*. Thus, there
was simply no "credibility" to undermine.
Ms. Fuller did not give damning testimony
and, even had trial counsel called Darlene
Fronius, there would have been "[absolutely
zero] probability that the outcome of the
challenged proceeding would have been
different."

Appellant also claims his counsel was
ineffective for failing to call Amanda

15

Perikaris, a woman who would testify that

> [S.], the victim in this case,
> also told someone that Mr. Fuller
> had inappropriate sexual contact
> with Miss Perikaris. [The victim]
> made the allegation that he had,
> at least that's what Miss
> Perdikaris would testify to, and
> Miss Perikaris would deny that Mr.
> Fuller ever had any inappropriate
> sexual contact with her.

> PCRA Hearing, 2/11/04, at 29.

> As the PCRA judge so well stated: "the
> proposed testimony was not relevant to the
> issues in this case and . . . bringing
> before the jury statements that Mr. Fuller
> allegedly had inappropriate sexual contact
> with another person would, at the very
> least, have been prejudicial to the
> defendant." PCRA Court Opinion, 7/14/04, at
> 12. We agree; appellant's strange argument
> is wholly without merit.

Sup.Ct.Op. dated pp. 6- 9 (doc. no. 13-14, pp. 25-28) (emphasis in original) (some internal citations omitted).

As revealed by the discussion above, the Pennsylvania Superior Court found that the absence of the proposed witness testimony did not render Petitioner's trial fundamentally unfair; nor was his counsel ineffective for failing to call these witnesses. Petitioner has not demonstrated that these holdings are contrary to, or an unreasonable application of, clearly established Federal law. Accordingly, Petitioner has not carried his burden of demonstrating that he is entitled to habeas corpus relief with respect to his second and third claims.

F. <u>Excessive Sentence</u>

Petitioner's final claim challenges the legality of his sentence. Petitioner is not entitled to habeas corpus relief with respect to this claim as he has failed to allege the denial of any federal constitutional right. In this regard, a state prisoner may seek federal habeas corpus relief only if he is in custody in violation of the Constitution or federal law. <u>Smith v. Phillips</u>, 455 U.S. 209 (1982); <u>Geschwendt v. Ryan</u>, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992); <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991). Thus, a writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982). Violations of state law or procedural rules alone are not a sufficient basis for providing federal habeas corpus relief. *Id*. Thus, a writ of habeas corpus is not available when a state prisoner merely alleges that something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in the state courts.

Generally, sentencing is a matter of state criminal procedure and does not fall within the purview of federal habeas

corpus.  <u>Wooten v. Bomar</u>, 361 U.S. 888 (1959).  As such, a federal court normally will not review a state sentencing determination that falls within the statutory limit, <u>Williams v. Duckworth</u>, 738 F.2d 828, 831 (7th Cir. 1984), as the severity of a sentence alone does not provide a basis for habeas relief. <u>Smith v. Wainwright</u>, 664 F.2d 1194 (11th Cir. 1981) (holding that a sentence imposed within the statutory limits can not be attacked in habeas proceeding).  *Accord* <u>Gleason v. Welborn</u>, 42 F.3d 1107, 1112 (7th Cir. 1994) (internal citation omitted), *cert. denied*, 514 U.S. 1109 (1995); <u>Walker v. Endell</u>, 850 F.2d 470, 476 (9th Cir. 1987), *cert. denied*, 488 U.S. 926 (1988); <u>Mira v. Marshall</u>, 806 F.2d 636, 639 (6th Cir. 1986); <u>United States v. Myers</u>, 374 F.2d 707 (3d Cir. 1967).  Thus, unless an issue of constitutional dimension is implicated in a sentencing argument, this Court is without power to grant habeas relief.  <u>United States v. Addonizio</u>, 442 U.S. 178, 186 (1979) (noting that a criminal sentence was not subject to collateral attack unless the sentencing court lacked jurisdiction to impose it or committed a constitutional error that made the sentence or underlying conviction fundamentally unfair).  *Accord* <u>Colon v. Folino</u>, 2008 WL 144212, at *9 (M. D. Pa. Jan. 11, 2008).

Absent a claim that the sentence constitutes cruel and

unusual punishment prohibited by the Eighth Amendment,[2] or that it is arbitrary or otherwise in violation of the Due Process Clause, the legality of a sentence is a question of state law. Chapman v. United States, 500 U.S. 453, 465 (1991). "[A] person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual ... and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Id.* (citations omitted).

Petitioner alleges that his sentence violates the Equal Protection Clause because he received a sentence of forty to ninety months along with a life-long sexual registration requirement under Megan's Law and an individual named Barry McCreary, who was found to be a violent sexual predator, was sentenced by the same judge on the same day to only 24 to 48 months imprisonment with only a ten year registration requirement.

The Equal Protection Clause provides that no state

_____

2.   A sentence violates the Eighth Amendment of the Constitution only when it is extreme and "grossly disproportionate to the crime." Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring) ("The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are grossly disproportionate to the crime.") (citation omitted).

shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.' " Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985)). *See also* United States v. Armstrong, 517 U.S. 456 (1996) (Equal Protection Clause prohibits decision to prosecute based on an unjustifiable standard such as race, religion, or other arbitrary classification).

The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification. Classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened or "strict" scrutiny. City of Cleburne, 473 U.S. at 439. Other classifications are subject to the "rational basis" test, which requires that a classification need only be rationally related to a legitimate state interest to survive an equal protection challenge. F.C.C. v. Beach Communications, Inc., 508 U.S. 307 (1993) (statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any

reasonably conceivable state of facts); <u>Chapman v. United States</u>,
500 U.S. 453, 465 (1991).

Prisoners are not a suspect class. <u>Lee v. Governor of
State of N.Y.</u>, 87 F.3d 55, 60 (2d Cir. 1996); <u>United States v.
King</u>, 62 F.3d 891, 895 (7th Cir. 1995); <u>Latham v. Brown</u>, 11 F.3d
1070, 1993 WL 394802 (D.C. Cir. 1993). Because prisoners are not
a suspect class, the government may treat defendants differently
as long as its decisions are "rationally related to a legitimate
... [government] interest." <u>King</u>, 62 F.3d at 895 (quoting <u>City
of Cleburne</u>, 473 U.S. at 440). Moreover, to demonstrate an equal
protection violation, an person has the burden of proving the
existence of purposeful discrimination. <u>Hernandez v. New York</u>,
500 U.S. 352 (1991); <u>McCleskey v. Kemp</u>, 481 U.S. 279, 292 (1987).
Official action does not violate the Equal Protection Clause
solely because it results in a disproportionate impact; proof of
discriminatory intent or purpose is required to show a violation.
<u>Village of Arlington Heights v. Metropolitan Housing Development
Corp.</u>, 429 U.S. 252, 265 (1977); <u>Washington v. Davis</u>, 426 U.S.
229, 239 (1977); <u>Stehney v. Perry</u>, 101 F.3d 925, 938 (3d Cir.
1996). Discriminatory purpose implies more than intent as
volition or intent as awareness of consequences. It implies that
the decisionmaker selected a particular course of action at least
in part because of, not merely in spite of, its adverse effects
upon an identifiable group. <u>Hernandez</u>, 500 U.S. at 360. In

other words, a person must offer evidence specific to his own case that would support an inference that unlawful considerations played a part in the adverse decision. <u>McCleskey</u>, 481 U.S. at 293.

It is firmly established that mere discrepancy in the sentences imposed upon two similarly-situated individuals does not constitute a violation of equal protection. *See* <u>Dorszynski v. United States</u>, 418 U.S. 424 (1974); <u>Jones v. Superintendent of Rahway State Prison</u>, 725 F.2d 40, 43 (3d Cir. 1984) (no equal protection violation where there was no contention that sentencing disparity was the result of discrimination based on race, sex or similar grounds). No two prisoners, being different human beings, will possess identical backgrounds and characters for purposes of sentencing. Indeed, it is difficult to believe that any two prisoners could ever be considered "similarly situated" for the purpose of judicial review on equal protection grounds of broadly discretionary decisions because such decisions may legitimately be informed by a broad variety of an individual's characteristics. Thus, the function of the court is limited to ensuring that, in sentencing Petitioner, the trial judge was in fact, exercising his professional judgment and not discriminating against him for reasons unrelated to legitimate security interests.

In this regard, in upholding Petitioner's sentence, the

Superior Court held as follows.

In the present action, the trial court
had the benefit of a pre-sentence report,
and was therefore fully aware of all
relevant circumstances. The trial judge, in
imposing the sentence of from forty months
to ninety months, explained his reasons for
the sentence imposed as follows:

In sentencing the defendant as we
have we've taken into
consideration the nature of the
offence and the seriousness of
aggravated indecent assault, a
felony of the second degree which,
as we have indicated, is
punishable by a term of
imprisonment of up to ten years in
prison and a fine of up to
$25,000.00. We have considered
the offense to which you have been
found guilty by a jury of your
peers. We have considered also
that you were in a supervisory
capacity over the victim of the
crime. We're also taking into
consideration that this conduct as
the victim testified to was
repeated over a period of time by
you. We have before us a pre-
sentence report, as I've
indicated, prepared by the Fayette
County Adult Probation Office
which we are taking into
consideration. We have also taken
into consideration your prior
record. We have taken into
consideration what we believe to
be your rehabilitative needs and
the gravity of this offense. The
Court feels that any lesser
sentence would certainly
depreciate the seriousness of this
crime. The Court feels that you
are in need of correctional
treatment that can be provided
most effectively by your

23

commitment to an institution.

N.T. December 12, 2002, pp.4-5.

> On this record we see no reason to disturb the sentence in this case. The sentencing court observed the appellant throughout these proceedings, studied his history, considered his prospective rehabilitation, and therefore was in the best possible position to determine an appropriate sentence. The trial court considered (1) the nature and gravity of the offense, (2) the statutory limit of incarceration, (3) the supervisory position of appellant, (4) the fact that the conduct was repeated and engaged in over a period of time, and (5) all other relevant factors, including the criminal history, character, and condition fo appellant. Under the facts of this case, there is absolutely no basis for the claim of appellant that the sentence of from forty months to ninety months was "unreasonable."

Sup.Ct.Op. dated October 17, 2003, pp. 8-10 (doc. no. 13-9, pp. 63-65) (internal citations omitted).

Here, the state courts found that the sentencing court imposed a legal sentence within the statutory limits and that the sentencing court gave legitimate reasons to support its decision. Consequently, Petitioner has failed to show that he is entitled to habeas corpus relief with respect to his sentencing claim.

## G. Certificate of Appealability

28 U.S.C. § 2253(c) codifies the standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of

24

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."

Petitioner has not made any showing that he was denied any of his constitutional rights. Accordingly, a certificate of appealability should be denied.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have ten (10) days from the date of service of the objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

Lisa Pupo Lenihan
U.S. Magistrate Judge

July 16, 2008

cc: Nora Barry Fischer
    United States District Judge

    Charles A. Fuller, SR.
    FG-2434
    S.C.I. at Houtzdale
    P.O. Box 1000
    Houtzdale, PA 16698